UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 18bk34548 |
| | ) | |
| Sindesmos Hellinikes-Kinotitos of Chicago, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge Timothy A. Barnes |
| | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

This matter comes on for consideration on the Motion for Entry of Order (I) Granting Relief from Amended Order Approving and Authorizing the Debtor to Sell Real Estate, Free and Clear of Liens and Encumbrances, to Assume and Assign Real Property Lease, and to Shorten Notice, and (II) Granting Related Relief [Dkt. No. 127] (the "Rule 60 Motion"), as originally brought by HT Preservation Society, Ltd. ("HTPS") and as joined by certain parishioners (the so-called "Concerned Parishioners" and together with HTPS, the "Movants") by way of the Joinder of Concerned Parishioners to Motion for Entry of Order (I) Granting Relief from Amended Order Approving and Authorizing the Debtor to Sell Real Estate, Free and Clear of Liens and Encumbrances, to Assume and Assign Real Property Lease, and to Shorten Notice, and (II) Granting Related Relief [Dkt. No. 132] (the "Joinder").[1]

In the Rule 60 Motion, without having objected to the Amended Order Approving and Authorizing the Debtor to Sell Real Estate, Free and Clear of Liens and Encumbrances, to Assume and Assign Real Property Lease, and to Shorten Notice [Dkt. No. 121] (the "Chicago Sale Order"), which Chicago Sale Order contained protections under section 363(m) of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), and after the appeal period for the Chicago Sale Order has passed, the Movants seek to have this court vacate the Chicago Sale Order for lack of authority of the debtor, Sindesmos Hellinikes-Kinotitos of Chicago (the "Debtor" or the "Holy Trinity Church"), to enter into the sale approved thereunder.

For the reasons stated more fully herein, after having set briefing on the Rule 60 Motion[2] and considered all of the filings in relation thereto, and after having conducted a hearing on October 15, 2019 (the "Hearing") at which each of the parties discussed herein appeared and was heard, the court concludes that the Movants have failed to establish the requirements to vacate the Chicago Sale Order under Federal Rule of Civil Procedure 60 ("Rule 60" specifically and generally, the "Rules"), made applicable in this matter by Federal Rule of Bankruptcy Procedure 9024

---

[1]     The Concerned Parishioners consist of John Karamitsos, Stavros Haidos, Olympia Haidos, Maria Vlahos, George Horaites and Spiro Kezios.  Joinder, at ¶ 5.

[2]     All further references to the Rule 60 Motion include the Joinder.

(generally, the "Bankruptcy Rules"). For that reason, the Rule 60 Motion should be, and by separate order entered concurrently herewith will be, denied.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy judge may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Instead, the bankruptcy judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, the bankruptcy judge must also have constitutional authority to hear and determine a matter. *See Stern v. Marshall*, 564 U.S. 462 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy judge hearing and determining the matter. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) (parties may consent expressly or impliedly to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The bankruptcy court, acting in the stead of the district court, has exclusive jurisdiction over the bankruptcy estate's assets, wherever located. 28 U.S.C. § 1334(e)(1). It follows that a motion concerning such assets is a matter concerning the administration of the estate and is therefore a statutorily core proceeding, 28 U.S.C. § 157(b)(2)(A), and a motion to sell such assets is expressly core. 28 U.S.C. § 157(b)(2)(N). It further follows that a motion to reconsider an order regarding such a motion concerning the sale of bankruptcy estate assets also arises in a case under the Bankruptcy Code. *See* Fed. R. Civ. P. 60; *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics)*, 813 F.2d 127, 130 (7th Cir. 1987) ("Doubtless courts may enforce their own orders.") (internal citations omitted); *In re Morrow*, 495 B.R. 378, 382 (Bankr. N.D. Ill. 2013) (Barnes, J.).

Based on the foregoing, except as otherwise noted herein, the court has the jurisdiction and statutory and constitutional authority to hear and determine this matter and to enter final orders with respect to the Rule 60 Motion.

HISTORY

The history of this matter extends not just to the case itself, but to another, prior bankruptcy case and the efforts, both in this court and elsewhere, of the Debtor's major secured creditor to collect on the obligations owed it.

The Debtor, the so-called Holy Trinity Church, is a religious corporation consisting of one of the oldest Greek Orthodox churches in this country. As will be discussed below, the church has existed in each of this and the previous two centuries. The Debtor's two major assets were, prior to the events unfolding as described herein, the church's nave (the "Chicago Property") and a second property where the Debtor, ultimately by agreement with and thus through the Hellenic American Academy Foundation (the "Academy"), operated a religious school (the "Deerfield Property" and together with the Chicago Property, the "Properties"). In addition, adjacent to the Chicago Property is a parking lot owed by the Debtor (the "Parking Lot").[3]

In 2007, the Debtor became indebted to MB Financial Bank, N.B. ("MBFB") for more than $8.2 million dollars. *See* Official Form 410, Proof of Claim of MB Financial Bank, N.A. (filed March 22, 2019) [Claim 4-1] (the "Bank Claim" and generally, the "Bank Loan"). Fifth Third Bank ("Fifth Third" and together with MBFB, the "Bank") is the successor in interest to the Bank Claim. According to filings by the Bank in this case, the money was borrowed to improve the Deerfield Property. *See* Mot. of MB Financial Bank N.A. for Order Excusing Receiver from Compliance with Sections 543(a) and 543(b) of the Bankruptcy Code, at ¶ 6 [Dkt. No. 17] (the "Receiver Motion"). As security for the Bank Claim, the Debtor granted the Bank mortgages and assignments of rent and executed related documents pertaining to both of the Properties, but not pertaining to the Parking Lot. *Id.* at ¶ 7.

According to MBFB, the Debtor defaulted on the Bank Loan some time in 2013 and MBFB served notices of default in 2013 and 2014. *Id.* at ¶ 13. In 2015, MBFB instituted foreclosure actions against the Chicago Property, *id.* at ¶ 14, but before a receiver could be appointed, the Debtor commenced its first chapter 11 bankruptcy case. *Id.* at ¶ 15. That case, *In re Sindesmos Hellinikes-Kinotitos of Chicago*, Case No. 15bk22446 (Bankr. N.D. Ill. filed June 29, 2015) (the "Prior Case"), was assigned to the undersigned.

For nearly three years, in the Prior Case, the Debtor attempted to formulate a plan of reorganization. Much of the early part of the case was focused on disputes between the Bank, the Debtor and the Academy regarding the school on the Deerfield Property. Ultimately, after the undersigned denied the Academy's claim, Order Sustaining Objection [Prior Case, Dkt. No. 173], and lifted the automatic stay to allow MBFB to pursue nonbankruptcy remedies with respect to the Properties, Order Modifying Automatic Stay [Prior Case, Dkt. No. 208], another judge sitting in the undersigned's stead ruled against the Academy on certain of its alleged claims in the Deerfield Property and, over the objection of the Academy, the court approved the sale of the Deerfield Property for approximately $3.7 million. Order (A) Approving the Sale of Real Estate to the Purchaser Free and Clear of Liens, Claims, Liabilities, and Encumbrances and (B) Granting Related

---

[3]      As the sale discussed herein of the Chicago Property included a sale of the Parking Lot, the court will use the term Chicago Property to describe both parcels and differentiate when and where that may be necessary.

Relief [Prior Case, Dkt. No. 228]. While the Academy appealed the rulings against it,[4] the Debtor in the meantime sought and received voluntary dismissal of the Prior Case. Order Dismissing Chapter 11 Proceeding [Prior Case, Dkt. No. 239].

After the dismissal of the Prior Case, MBFB continued its foreclosure action against the Chicago Property, this time obtaining the appointment of a receiver in April 2018. Receiver Mot., at ¶ 18. However, on the morning of the scheduled foreclosure sale of the Chicago Property, on December 14, 2018, the Debtor once again commenced a chapter 11 proceeding—the above-captioned bankruptcy case.

In this case, MBFB sought to be excused from the requirements of sections 543(a) & (b) of the Bankruptcy Code so as to remain in legal possession of the Chicago Property. *See* Receiver Mot., at ¶ 25 *et passim*. That request was granted. Supplemental Order on Motion to Excuse Receiver from Compliance with Sections 543(a) and 543(b) of the Bankruptcy Code [Dkt. No. 35].[5] Further, the Debtor sought and received approval to offer both of the Properties and the Parking Lot for sale. *See* Order Authorizing and Approving Bidding, Auction and Sale Procedures and Setting Hearing to Approve Sale of Assets [Dkt. No. 68], as amended by Order Authorizing and Approving Amended Bidding, Auction and Sale Procedures and Setting Hearing to Approve Sale of Assets [Dkt. No. 79] (together, the "Sale Procedures Order").

Under the Sale Procedures Order, the Debtor extensively marketed the Properties and the Parking Lot and, ultimately, contracted to sell the Deerfield Property to Olympia Acquisitions LLC for the much lower amount of $1,650,000.00. *See* Debtor's Motion to Approve Sale of the Deerfield Property Free and Clear of Liens, Claims, Liabilities, and Encumbrances and to Shorten Notice, at ¶ 15 [Dkt. No. 103] (the "Deerfield Sale Motion"). The Debtor also contracted to sell the Chicago Property and the Parking Lot to The Universal Church, Inc. (the "Chicago Buyer") for $2,500,000.00. *See* Debtor's Motion to Approve Sale of the Chicago Property Free and Clear of Liens, Claims, Liabilities and Encumbrances, to Assume and Assign Real Property Lease, and to Shorten Notice, at ¶ 17 [Dkt. No. 110] (the "Chicago Sale Motion").

A hearing was held by the court on September 10, 2019, on both the Deerfield Sale Motion and the Chicago Sale Motion. Despite there being an unusually full gallery of onlookers, no party raised any objection to or other concerns regarding the two proposed sales. After considering the requirements for sales under section 363 of the Bankruptcy Code, the unopposed allegations in the motions and the history of this matter generally, in the absence of any objection, this court approved both of the sales. *See* Amended Order Approving and Authorizing the Debtor to Sell Real Estate, Free and Clear of Liens and Encumbrances, and to Shorten Notice [Dkt. No. 120] (the "Deerfield Sale Order"); Chicago Sale Order.

Each of the Deerfield Sale Order and the Chicago Sale Order contained protections for the respective buyers thereunder under section 363(m) of the Bankruptcy Code. Deerfield Sale Order, at ¶ 4; Chicago Sale Order, at ¶ 4. Each order also waived the stay of effectiveness under

---

[4]     The Academy's appeals were dismissed by either its own stipulation or request to dismiss. [Prior Case, Dkt. Nos. 243, 244].

[5]     The court mistakenly at the Hearing observed that this had not occurred. That mistake does not affect the outcome in this matter.

Bankruptcy Rules 6004.  Deerfield Sale Order, at ¶ 6; Chicago Sale Order, at ¶ 7; *see also* Fed. R. Bankr. P. 6004(h).

Three weeks after the entry of the sale orders, after the expiration of the appeal period with respect thereto, *see* Fed. R. Bank. P. 8001(a)(1), and without any extension of that period, *see* Fed. R. Bankr. P. 8001(b), on October 1, 2019, HTPS applied to this court for a hearing on an emergency basis. App. to Set Hr'g on Emergency Mot. [Dkt. No. 125] (the "Application"). That same day, the court granted the Application and instructed HTPS to file their motion and schedule the hearing on such motion for October 2, 2019 (the "Emergency Hearing"). Order [Granting Application to Set Emergency Hearing] [Dkt. No. 126]. HTPS thereafter filed the Rule 60 Motion and scheduled it to be heard at the Emergency Hearing.

At the Emergency Hearing, HTPS appeared in support of the Rule 60 Motion. The Debtor, Fifth Third, the Chicago Purchaser (collectively, the "Opposing Parties"), along with the United States Trustee (the "U.S. Trustee"), all appeared and raised a variety of arguments in opposition.

Chief among the arguments against the Rule 60 Motion was that HTPS did not have the requisite standing to bring the Rule 60 Motion. After learning that HTPS was created by various parishioners of the Holy Trinity Church and other concerned parties after the entry of the Chicago Sale Order, formed for the sole purpose of bringing the Rule 60 Motion, the court ruled that HTPS did not have standing to seek the relief requested. As an entity that did not exist at the time the Chicago Sale Order was entered and not the possessor of the parishioners' rights asserted in the Rule 60 Motion, HTPS could not possibly establish that it had an interest directly affected by the Chicago Sale Order. *In re Andreuccetti*, 975 F.2d 413, 416–17 (7th Cir. 1992).

Accordingly, at the conclusion of the Emergency Hearing, the court entered an order permitting one or more of the parishioners to join as parties to the Rule 60 Motion before the end of the day of the Emergency Hearing. Scheduling Order with Interim Stay [Dkt. No. 130] (the "First Scheduling Order"). The First Scheduling Order provided that, without any joinder being timely filed, the Rule 60 Motion would be denied, but with a joinder, the court would hold a hearing the next day, on October 3, 2019, to address the threshold issue of whether such parishioners themselves have standing to seek the relief requested in the Rule 60 Motion (the "Second Hearing"). *Id.* Further, and as will be discussed in more detail below, the court stayed the Chicago Sale Order until the conclusion of the Second Hearing. Later that day, pursuant to the First Scheduling Order, the Concerned Parishioners filed the Joinder, thus necessitating the Second Hearing.

At the Second Hearing on October 3, 2019, the court again took up the issue of standing, this time with respect to the Concerned Parishioners. For the reasons more fully discussed below, the court found that the Concerned Parishioners had established a sufficient claim to standing so as to require the Opposing Parties to respond to the Rule 60 Motion. Accordingly, at the conclusion of the Second Hearing, the court ordered a briefing schedule on the Rule 60 Motion, set the Hearing on what would be then the fully briefed Rule 60 Motion, and further stayed the Chicago Sale Order until the conclusion of the Hearing. Second Scheduling Order with Interim Stay [Dkt. No. 137] (the "Second Scheduling Order"). The court also dismissed HTPS as a party to the Rule 60 Motion, leaving the Concerned Parishioners as the sole movants. *Id.*

In accordance with the Second Scheduling Order, on October 8, 2019, the Opposing Parties each filed briefs in opposition to the Rule 60 Motion. Debtor's Response in Opposition to the HT Preservation Society and Certain Parishioners' Rule 60(b) Motion to Vacate the Order Authorizing

the Sale of the Chicago Property to Universal Church, Inc. [Dkt. No. 138] (the "Debtor's Response"); Response of Fifth Third Bank to Motion to Vacate Sale Order [Dkt. No. 140] (the "Bank's Response"); The Universal Church's Response to the Parishioner's Motion for Relief from Judgment or Order [Dkt. No. 141]. Three days later, on October 11, 2019, the Concerned Parishioners filed their Reply in Support of Motion for Entry of Order (I) Granting Relief From Amended Order Approving and Authorizing the Debtor to Sell Real Estate, Free and Clear of Liens and Encumbrances, to Assume and Assign Real Property Lease, and to Shorten Notice, and (II) Granting Further Relief [Dkt. No. 145] (the "Reply") and that same day, the Debtor and the Concerned Parishioners jointly filed Stipulations of Fact Regarding Governance Documents [Dkt. No. 143] (the "Stipulations").

On October 15, 2019, the parties appeared for the Hearing. After considering the arguments presented and the fully briefed Rule 60 Motion, the court informed the parties it would take the matter under advisement. Accordingly, the court entered an order staying the Chicago Sale Order once again until the resolution of the Rule 60 Motion, as addressed by this Memorandum Decision. Third Scheduling Order with Interim Stay [Dkt. No. 146] (the "Third Scheduling Order").

This Memorandum Decision constitutes the court's determination of the fully briefed matters under advisement. In reaching the conclusions set forth herein, the court has taken into account all of the foregoing history and filings, including any and all exhibits submitted in conjunction with the foregoing. Though the foregoing filings do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case and the Prior Case, the court has taken judicial notice of the contents of the docket in this case and in the Prior Case. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

## APPLICABLE LAW

While the Rule 60 Motion raises a variety of legal issues discussed below, the Rule 60 Motion is at its essence a request to vacate the Chicago Sale Order under Rule 60(b)(1) for an alleged lack of authority. *See* Rule 60 Mot., at ¶ 33–35. The Rule 60 Motion also asserts a request under Rule 60(b)(6) for the same reasons. *See id.*, at ¶ 39.

Rule 60, which as noted above, is applicable in bankruptcy matters by virtue of Bankruptcy Rule 9024, states in pertinent part as follows:

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

. . . ; or

(6) any other reason that justifies relief.

(c) Timing and Effect of the Motion.

(1) Timing. A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

(2) Effect on Finality. The motion does not affect the judgment's finality or suspend its operation.

Fed. R. Civ. P. 60(b)(1), (6), (c).

Relief from a prior judgment or order under Rule 60(b) is an extraordinary remedy that is granted only in exceptional circumstances. *Bell v. Eastman Kodak Co.*, 214 F.3d 798, 801 (7th Cir. 2000); *Indus. Assocs., Inc. v. Goff Corp.*, 787 F.2d 268, 269 (7th Cir. 1986) (*citing Klapprott v. Untied States*, 335 U.S. 601, (1949)). "Rule 60(b) motions are addressed to the discretion of the Court, and the burden of establishing proper grounds for such relief rests upon the movant." *Nat'l Bank of Joliet v. W. H. Barber Oil Co.*, 69 F.R.D. 107, 109 (N.D. Ill. 1975) (internal citations omitted); *see also Helm v. Resolution Tr. Corp.*, 84 F.3d 874, 877–79 (7th Cir. 1996).

Prior to the implementation of Rule 60, federal courts used their "inherent judicial power to reconsider [] judgments within a reasonable time, including judgments confirming sales." *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1018 (7th Cir. 1988), *cert. denied*, 390 U.S. 1006 (1989). By implementing Rule 60 in bankruptcy matters, the Judicial Conference of the United States codified and replaced that traditional approach.

Rule 60(b)(1) has as its essential purpose creating a way, other than by appeal, for the court to correct mistakes in a final judgment or order entered by the court. *Mendez v. Republic Bank*, 725 F.3d 651, 659 (7th Cir. 2013) ("Rule 60(b) allows a district court to correct its own errors that could be corrected on appeal, at least if the motion is not a device to avoid expired appellate time limits.").

Rule 60(b)(6), on the other hand, the so-called "catchall provision," may not be invoked as grounds for relief for an argument that fits within the other sections of Rule 60. *Indus. Assocs.*, 787 F.2d at 269; *see also Met-L-Wood*, 861 F.2d at 1018 (noting that Rule 60(b)(6) expressly refers to "any *other* reason that justifies relief") (emphasis in original); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988) (Rule 60(b)(6) motion may not be "premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)"); *Arrieta v. Battaglia*, 461 F.3d 861, 865 (7th Cir. 2006) (same).[6]

---

[6]    Except possibly in relation to notice, the Rule 60(b)(6) argument has essentially been abandoned by the Concerned Parishioners. While it was raised in the original Rule 60 Motion and that motion was joined in all respects by the Concerned Parishioners, *see* Joinder, at ¶ 5, no mention of it has been made in the Reply or in the arguments at the various hearings. Even if not abandoned, it is not well taken here. The Rule 60 Motion makes no independent argument for relief under this subsection, again arguing that lack of authority is grounds for relief. As such argument falls within the ambit of Rule 60(b)(1), it may not be advanced under Rule 60(b)(6).

    As discussed below, Concerned Parishioners did address certain notice arguments in the Reply without stating how, if at all, the alleged lack of notice fits within Rule 60. *See* Reply, at ¶¶ 26–28 *et passim*. Such arguments might be considered ones under Rule 60(b)(6), but as discussed *infra*, those notice arguments fail.

Regardless of the subsection, the determination of a Rule 60 motion is left to the discretion of the trial court. *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 45 (7th Cir. 1994). The Seventh Circuit has made clear that the trial court has broad discretion in that regard, *Mendez*, 725 F.3d at 657 (trial courts "are given broad discretion to deny motions for relief from judgment."), as the decision to grant relief "is closely related to the circumstances of the judgment and the equities of a particular case." *Id.; see also Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir.2009) ("The district court has great latitude in making a Rule 60(b) decision because that decision is discretion piled on discretion.") (internal citation and quotation marks omitted).

With that in mind, the court turns to the matter at bar.

## DISCUSSION

As noted above, while the matter before the court is squarely a question of whether or not to apply Rule 60 to void a previous order of the bankruptcy court, the legal issues it presents are manifold.

To address those issues, the court first considers several gating questions, namely whether the fact that the Chicago Sale Order as an asset sale order offering good faith purchaser protections restrains this court's consideration and whether this court's decision to stay the Chicago Sale Order pending determination of the Rule 60 Motion was correct.

Having considered those issues, the court next turns to the central issue plaguing this matter from the start, standing.

Only after having considered standing does this court turn to the substantive question concerning lack of authority, raised as grounds for the Rule 60 Motion. In considering this substantive issue, the court examines the limitations on its review in light of the ecclesiastical nature of the Debtor and the rules governing the Debtor's behavior.

After considering each of the foregoing, the court concludes by applying the issues raised to the case at bar. The result, as has been noted earlier, does not favor the Concerned Parishioners.

A.   The Gating Questions

1.   *How Does Section 363(m) Affect Rule 60 Motions?*

One of the arguments raised by the Opposing Parties is that the court should not countenance the Rule 60 Motion at all, as it is, for all intents and purposes, a collateral attack on an otherwise final sale order containing protections under section 363(m) of the Bankruptcy Code.

Section 363(m) states that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m). A finding under section 363(m) affords the buyer an "ironclad" defense to attempts to undo the sale on appeal. *Trinity 83 Dev., LLC v. ColFin Midwest Funding, LLC*, 917 F.3d 599, 603 (7th Cir. 2019). It does not, however, act to deny

a court jurisdiction to consider other challenges to a sale. *Id.* The Chicago Sale Order expressly contained a section 363(m) finding of good faith. Chicago Sale Order, at ¶ 4.

The finality afforded sales to good faith purchasers under section 363(m) is an essential protection for buyers of assets from bankruptcy estates. *In re River W. Plaza–Chicago, LLC,* 664 F.3d 668, 671 (7th Cir. 2011) ("Because 'purchasers are likely to demand a steep discount' when purchasing a bankruptcy debtor's property if the sale can later be disturbed, *In re Sax,* 796 F.2d 994, 998 (7th Cir. 1986) (citation omitted), Congress has decided that bankruptcy sales are usually final.").

The finality afforded under section 363(m), however, applies only in accordance with the express terms of the statute. While the Opposing Parties urge this court to decline to hear the Rule 60 Motion as it circumvents the finality of the Chicago Sale Order, such an argument is outside the bounds of section 363(m) and at odds with the governing Seventh Circuit law in this arena.

The previously noted *Met-L-Wood* case illustrates this point. There, though a bankruptcy court had approved a sale of substantially all of a chapter 11 debtor's assets, after conversion of the case to one under chapter 7, the chapter 7 trustee attempted to challenge the earlier sale on the ground that the bidding was rigged and that the bankruptcy court had engaged in improper *ex parte* communications with the firm representing the debtor. *Met-L-Wood,* 861 F.2d at 1014–16. To do so, the trustee brought a freestanding civil suit, separate from the underlying bankruptcy case, to challenge the sale and also brought a Rule 60(b)(3) motion in the underlying bankruptcy case seeking the vacatur of the order authorizing the sale. *Id.* at 1016. The lawsuit was dismissed and the Rule 60(b) motion denied, the latter for violation of the express timing constraints under Rule 60(c). *Id.*

On appeal, the Seventh Circuit affirmed. *Id.* at 1018–19. In so doing, the Circuit addressed the interaction of appeals of sale confirmation orders and Rule 60(b) motions to vacate such orders. The Circuit first noted that the trustee's freestanding suit was inappropriate on preclusion principles and that the failure to bring a timely appeal of an order approving a sale prevented such a party from collaterally attacking such order in a separate lawsuit. *Id.* at 1017.

The Circuit confirmed, however, that a Rule 60(b) motion is the only proper way to challenge a final sale order outside the time to appeal such order. *Id.* at 1018 ("[W]e hold that confirmed sales—which are final judicial orders—can be set aside only under Rule 60(b)."). The Seventh Circuit has consistently applied the ruling in *Met-L-Wood* in matters arising thereafter, allowing Rule 60 reconsideration of bankruptcy sales. *See, e.g., La Preferida, Inc. v. Cerveceria Modelo, S.A. de C. V.,* 914 F.2d 900, 908 (7th Cir. 1990) ("[E]xcept for the narrow exceptions set forth in Rule 60(b), bankruptcy sales, if they are to fulfill their role, must be final when made."); *FutureSource LLC v. Reuters Ltd.,* 312 F.3d 281, 286 (7th Cir. 2002) ("[T]he order approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits that Fed. R. Civ. P. 60(b) imposes on collateral attacks on civil judgments.").

The Seventh Circuit has, however, consistently rejected the use of Rule 60 motions to correct appealable errors outside the time for bringing appeals. *See, e.g., Mendez,* 725 F.3d at 659 (citing numerous prior Seventh Circuit cases). In deciding *Mendez,* the Circuit explained that "[i]f parties or courts could use Rule 60(b) to revive cases in which a party failed to appeal within the standard deadline, Appellate Rule 4 would lose much of its force. That is why we have held in the cases cited above that Rule 60(b) relief is appropriately denied when a party fails to file a timely appeal and the relief sought could have been attained on appeal." *Id.* Further explaining this

position, the Circuit made clear that Rule 60 may be used "when the concern about circumventing the deadline to appeal is absent." *Id.*

This guidance is particularly germane here, where the appeal period has also passed. Further, as section 363(m) provides for finality, but only in the instance of appeals, and as the sale has not yet closed, the Rule 60 Motion seeks to do what even a timely appeal, assuming no stay pending appeal,[7] could not, prevent the sale's consummation. The Rule 60 Motion thus firmly wedges itself into a loophole in the protections afforded good faith purchasers under section 363(m).

That loophole triggers just the kind of concern expressed by the Seventh Circuit in *Mendez*. As the Circuit reiterated in *Met-L-Wood*, "[u]nless bankruptcy sales are final when made, rather than subject to being ripped open years later, high prices will not be offered for the assets of bankrupt firms—and the principal losers (pun intended) will be unsecured creditors." *Met-L-Wood*, 861 F.2d at 1019.

There is no doubt here that the errors alleged by the Concerned Parishioners are ones which could have been addressed on appeal. As such an appeal would not, however, affect the validity of a sale closed pursuant to the Chicago Sale Order, such an appeal could be meaningless. There is, therefore, a possibility that the Rule 60 Motion may be an attempt to circumvent the finality of the sale order under section 363(m). If true, such an attempt should no more be countenanced than an attempt the circumvent the timing requirements of the appellate rules.

Thus, while the sale was protected under section 363(m), that does not preclude this court's jurisdiction over and consideration of the Rule 60 Motion. Nonetheless, that the sale was protected under section 363(m) is meaningful, and the fact that the Rule 60 Motion was brought in the manner and timing in which it was militates against granting the relief sought therein. As the determination to grant Rule 60 motions is left within the discretion of the trial court, *Mendez*, 725 F.3d at 657 (trial courts "are given broad discretion to deny motions for relief from judgment"), the court, in considering the remainder of the issues before, must and will bear this concern in mind.

2.   *The Stay of the Chicago Sale Order*

As noted above, the sale of the Chicago Property had not closed when the Rule 60 Motion was brought, though three weeks had passed since the entry of the Chicago Sale Order. This is somewhat troubling as the Debtor represented to the court that the Chicago Purchaser was the only buyer ready and willing to close in short order.

The failure to close the sale clearly attenuates the risk to the Chicago Purchaser. Had the sale closed prior to the bringing of the Rule 60 Motion, that fact would likely decisively tip scales against the Rule 60 Motion. Because the closing of the sale would upset the balance of consideration on the Rule 60 Motion, no such consideration would be prudent without first preserving the *status quo*.

The simple solution in this matter was for the court to do as it did—stay the Chicago Sale Order pending a determination of the Rule 60 Motion. As with all things pertaining to the issue at

---

[7]   The imposition of a stay pending appeal is an extraordinary remedy. *Kuri v. Edelman*, 491 F.2d 684, 687 (7th Cir. 1974).

bar, however, the simple solution is not so simple, as the power to stay the Chicago Sale Order is not immediately clear.

Under Bankruptcy Rule 6004, sale orders are stayed for 14 days unless the court orders otherwise. Fed. R. Bankr. P. 6004(h). Here, the court ordered otherwise in the Chicago Sale Order, ordering Bankruptcy Rule 6004(h)'s stay to be not applicable to the sale. Chicago Sale Order, at ¶ 7. The parties were thus free to consummate the sale prior to the matter at bar. They did not. The court could have, of course, reconsidered its ruling on Bankruptcy Rule 6004(h) in order to reconsider the approval of the sale generally, but the circularity of that option is self-evident. Barring such a stay under Bankruptcy Rule 6004, however, the rule-based authority to stay an order is limited.

When the prospect of a stay was raised, the Bank urged the court to adopt the procedures for a stay pending appeal, *see* Fed. R. Bankr. P. 8007, namely, to condition any such stay on the issuance of a bond. Fed. R. Bankr. P. 8007(c). That approach is flawed for several reasons. First, as is self-evident, this matter is not an appeal and thus Bankruptcy Rule 8007 does not, by its own terms, apply. Even if it did apply, bonds under this rule are discretionary, not mandatory. *See infra.*

The actual method of staying the Chicago Sale Order is found in Rule 62. Rule 62, made applicable in bankruptcy adversary proceedings by Bankruptcy Rule 7062, authorizes a bankruptcy court to stay its judgments pending determination of a Rule 60 motion. *See, e.g., In re Harlan,* Case No. 05-13794-H11, 2006 WL 6591974, at *4 (Bankr. S.D. Cal. Nov. 20, 2006). This, of course, is not an adversary proceeding, so the rules in Part VII of the Bankruptcy Rules are not automatically applicable herein. *See* Fed. R. Bankr. P. 7001. Rule 62 may, however, apply in other instances.

Contested matters in bankruptcy apply some of the rules of adversary proceedings automatically, while others are left to the discretion of the bankruptcy judge. Fed. R. Bankr. P. 9014(c). In particular, the application of Bankruptcy Rule 7062 and thus Rule 62 to contested matters is left to the discretion of the bankruptcy judge. *Id.; see also id.* advisory committee's note to 1999 amendments ("Although Rule 7062 will not apply automatically in contested matters, the amended rule permits the court, in its discretion, to order that Rule 7062 apply in a particular matter . . . ."); 10 COLLIER ON BANKRUPTCY ¶ 7062.03 (15th ed. rev. 2008).

While a sale motion is not an adversary proceeding, a sale of bankruptcy estate assets free and clear of all liens and interests under section 363(f)—as was the case here—is a contested matter. Fed. R. Bankr. P. 6004(c). So too is a bankruptcy sale of any nature if objected to. Fed. R. Bankr. P. 6004(b). It follows, therefore, that a motion under Rule 60, which is in essence an objection brought after the fact, challenging a sale under section 363(f), is also a contested matter.

Directing Bankruptcy Rule 7062 and thus Rule 62 to apply to this matter is therefore within the authority conferred upon and discretion of the court.

Here the court believes it reasonable to order under Bankruptcy Rule 9014(c) that Bankruptcy Rule 7062 and thus Rule 62 apply to this matter so as to preserve the *status quo* pending a determination of the Rule 60 Motion. The allegations of lack of authority, if proven, call into question the validity of the Chicago Sale Order. Allowing an inquiry into authority to be potentially mooted by application of section 363(m) by the consummation of a sale while reconsideration is sought is abhorrent to the purposes of obtaining a just resolution of the matters before the court.

In applying these rules, the court ordered that the Chicago Sale Order be stayed "until the entry of an order by the court resolving the [Rule 60] Motion." Third Scheduling Order, at ¶ 1. That is within the court's authority under the rules, which provide that orders in bankruptcy matters to which such rules are applicable are stayed automatically for fourteen days *unless the court orders otherwise.* Fed. R. Bankr. P. 7062(a); Fed. R. Civ. P. 62(a). This court's stay is an order otherwise.

The court did not stay this matter lightly, given the primacy of the finality of bankruptcy sales noted above. Given the seemingly legitimate concerns being raised by the Concerned Parishioners and the statements of the Chicago Purchaser at the hearings that indicated a closing of the sale was not imminent, the court determined that issuing a stay under these rules was appropriate and in so doing balanced the parties' positions, potential harms and chances of success on the merits. *Cf. In re Fulton*, 588 B.R. 834, 845 (Bankr. N.D. Ill. 2018) (Schmetterer, J.) (setting forth the criteria in the Seventh Circuit for issuing stays pending appeal) (*citing In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997)).

The court considered, in so doing, the Bank's assertion that a bond was required for such a stay to be imposed. As noted above, bonds on stays pending bankruptcy appeals are discretionary. Fed. R. Bankr. P. 8007(c); *accord In re Carlson*, 224 F.3d 716, 719 (7th Cir. 2000). Rule 62 also references bonds and does so in much the same way as Bankruptcy Rule 8007. It does not provide when bonds are required, only when they are not. Rule 62 thus leaves the question of a bond to the discretion of the court. Bonds are not mandatory, as has been clarified by the Seventh Circuit when it explained that, "[a]lthough a textual argument can be made that Rule 62(d) makes the posting of a supersedeas bond mandatory, so that if a bond is not posted the judgment creditor can begin to execute the judgment immediately even though an appeal is pending, we agree with the contrary conclusion in *Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 757–60 (D.C. Cir. 1980)." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986). The Seventh Circuit further clarified that "[t]he dictum in *Donovan v. Fall River Foundry Co.*, 696 F.2d 524, 526 (7th Cir. 1982) . . . is not inconsistent with *Federal Prescription Service*. We merely said that posting a bond entitles the appellant to a stay of execution pending appeal; that is of course what Rule 62(d) says; if he does not post a bond, he risks the district judge's deciding to deny a stay." *Id.*

The case law regarding exercise of that discretion is not helpful in the matter at bar, *see, e.g.*, *Dillon v. City of Chi.*, 866 F.2d 902, 904 (7th Cir. 1988) (stating criteria for staying a money judgment), as the criteria discussed by the courts do not lend themselves well to Rule 62 as directed to apply to a sale order under Bankruptcy Rule 9014. Most cases apply instead to the appeal of monetary judgments. In *Carlson*, however, the Seventh Circuit noted that a judge should not require a bond only if the judge had "no other concern that the appellee's rights will be compromised by a failure adequately to secure the judgment." *Carlson*, 224 F.3d at 719.

Here, as noted by the court, given the short time frame under which the Rule 60 Motion would be heard and determined and the statements of the Chicago Purchaser that made clear that a closing was not imminent, any concern the court might have in that regard were alleviated. The court thus concluded that no bond would be required.

B.    Standing

The standing of the Movants to be heard in this matter has been the most vigorously disputed point of contention. While the court has already addressed the lack of standing of HTPS,[8] in finding that the Concerned Parishioners had made a facial showing of standing—enough to merit briefing the Rule 60 Motion rather than denying it outright—the court expressly reserved the ultimate question of whether or not the Concerned Parishioners have standing in this matter.

As to that question, the court considers first the traditional rules of standing as they apply to bankruptcy matters in the Seventh Circuit, followed by the argument of the Opposing Parties that the Concerned Parishioners have no standing as they failed to object to the entry of the Chicago Sale Order.

1.    *Bankruptcy Standing Generally and the Pecuniary Interest Rule*

This court has addressed standing in bankruptcy matters before. *In re Whitlock-Young*, 571 B.R. 795, 803–04 (Bankr. N.D. Ill. 2017) (Barnes, J.). There, the undersigned stated that "[s]tanding questions arise on two levels: the Article III case or controversy question and the question regarding prudential limits on a court's exercise of its authority." *Id.* at 804 (*citing United States v. Windsor*, 570 U.S. 744, 756 (2013) (criticizing an argument which "elides the distinction between two principles: the jurisdictional requirements of Article III and the prudential limits on its exercise.")); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) ("[O]ur standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement; and prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction.") (citations omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As to Article III standing, "[i]n every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove*, 542 U.S. at 11. "When standing is at issue, the central inquiry is 'whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *Whitlock-Young*, 571 B.R. at 803 (*quoting Simon v. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976) (*quoting Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (emphasis omitted)); *see also Andreuccetti*, 975 F.2d at 416–17.

Some courts have stated that bankruptcy courts, as Article I courts, need not be bound by Article III standing. *E.g.*, *Gibbs & Bruns LLP v. Coho Energy Inc. (In re Coho Energy Inc.)*, 395 F.3d 198, 202 (5th Cir. 2004) ("Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing.") (*quoting Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)). Such courts appear to hold that the only standing concern faced by bankruptcy courts is prudential standing, in their words, a "person aggrieved." *Id.*

---

[8]    As was noted above, the court has previously found that HTPS, as a legal entity with its own rights and responsibility separate and apart from the parishioners of the Debtor and as an entity only created after the entry of the Chicago Sale Order, lacks standing in this matter. *See* Second Scheduling Order, at ¶ 1. As a result, this Memorandum Decision discusses standing only in relation to the Concerned Parishioners.

This is not the approach taken in the Seventh Circuit, however, which instead treats prudential standing more in line with that discussed in the *Windsor* case, as a constraint on Article III standing but not as a substitute for it. *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir. 2007) (prudential standing "precludes the federal courts from exercising jurisdiction over some types of case[s] that Article III would not forbid the courts to adjudicate.").

In bankruptcy, there is also, however, the question of statutory standing. *See Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 884 (9th Cir. 2012) ("To have standing in bankruptcy court, Appellants must meet three requirements: (1) they must meet statutory 'party in interest' requirements under § 1109(b) of the bankruptcy code; (2) they must satisfy Article III constitutional requirements; and (3) they must meet federal court prudential standing requirements."). A co-debtor, for example, has a statutory right to be heard on a motion for relief from the co-debtor stay, even though such co-debtor is not a party-in-interest under other provisions of the Bankruptcy Code. *See, e.g.,* 11 U.S.C. § 1301(d); *Whitlock-Young*, 571 B.R. at 804 (noting that section 1301(d) expressly indicates that the co-debtor may object to a request for relief from the co-debtor stay); 11 U.S.C. § 1109(b) (providing a nonexclusive list of parties in interest with the right to be heard in chapter 11 cases as "*including* the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee" but not a co-debtor) (emphasis added).

*Thorpe Insulation* seems to go a step further than the Seventh Circuit's blending of Article III and prudential standing, stating that all three forms of standing must exist for a party to be heard. That seems wrong. As noted above, prudential standing is a judicially imposed concept, while statutory standing is imposed by Congress If Congress afforded a party a right to be heard, it is hard to see how that party can be denied standing and thus the very right that Congress conveyed. The better practice is to view Article III standing, as possibly restrained by prudential considerations, as a parallel to statutory standing. Of course, if the statute limits standing, as does section 1125 of the Bankruptcy Code, that would supersede Article III standing unless the limitation is legally unsound. *See, e.g.,* 11 U.S.C. § 1125(d) (affording an agency or official whose duty is to administer or enforce nonbankruptcy solicitation laws, rules or regulations, the right to be heard on the whether a disclosure statement contains adequate information, but no right of appeal thereafter).

Here, the Bankruptcy Code is not helpful on who might be heard in the context of a Rule 60 motion, as the section 1109 list of parties in interest who may be heard in chapter 11 matters is nonexhaustive. 11 U.S.C. § 1109(b); 11 U.S.C. § 102(3) ("including" is "not limiting"); *In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014) (section 1109(b) is nonexhaustive). The statute is therefore neutral on the issue of standing in this matter.

Assuming for the moment that any party with statutory standing would be required to be noticed of the matter, the Bankruptcy Rules might offer some guidance. Bankruptcy Rule 2002 states what parties must be given notice of a bankruptcy sale under section 363(b). Fed. R. Bankr. P. 2002(a)(2) (requiring notice to the "debtor, the trustee, all creditors and indenture trustees"); Fed. R. Bankr. P. 2002(d)(3) (chapter 11 notices of the sale of all or substantially all of a debtor's assets must also be given to equity security holders); Fed. R. Bankr. P. 2002(i) (Bankruptcy Rule 2002(a) notices shall also go to committees); Fed. R. Bankr. P. 2002(k) (Bankruptcy Rule 2002(a)(2) notices shall also go to the United States Trustee). That duty is confirmed by Bankruptcy Rule 6004(a),

which governs such sales.[9] Service of a motion to approve a sale under section 363(f), on the other hand, is required "on the parties who have liens or other interests in the property to be sold" if the sale is to be free and clear of such interests. Fed. R. Bankr. P. 6004(c). The only category here in which the Concerned Parishioners might be addressed is the last, as parties who allege an interest in property to be sold.

The Seventh Circuit, while misapplying section 1109 in chapter 7 matters, 11 U.S.C. § 103(g) ("subchapters I, II, and III of chapter 11 of this title apply only in a case under such chapter"), has nonetheless offered some guidance on the standing issue in the *C.P. Hall* case. There, the Seventh Circuit noted that "to become a party to the bankruptcy proceeding [a movant] had to show not merely standing but that 'a legislatively conferred cause of action encompasses' its claim." *C.P. Hall Co.*, 750 F.3d at 661 (*quoting Lexmark*, 572 U.S. at 127). That, by any other terms, is statutory standing.

Further clarifying, the Seventh Circuit stated that to be heard, a party must be "someone who has a *legally recognized interest* in the debtor's assets," not just someone who "may suffer collateral damage from a ruling in a bankruptcy proceeding." *Id.* (emphasis added).

The court has not yet determined if the Concerned Parishioners have an interest in the Chicago Property (it will take up the question when discussing authority), so the court must conclude for the moment that the question of statutory standing is unsettled.

That leaves Article III standing and its prudential limitations.

Here the Seventh Circuit precedent appears to blend these considerations into the so-called "pecuniary interest" rule to which the parties have given much consideration. *See, e.g., Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.)*, 151 F.3d 605, 607 (7th Cir. 1998). In *Cult Awareness*, the Seventh Circuit stated in no uncertain terms that "[t]o have standing to object to a bankruptcy order, a person must have a pecuniary interest in the outcome of the bankruptcy proceedings. Only those persons affected pecuniarily by a bankruptcy order have standing to appeal that order." *Id.*

While that language appears absolute on its face, there are several reasons not to apply it in such stark terms here.

First, the Seventh Circuit itself has made clear that *Cult Awareness* does not overrule prior precedent of the Circuit, *C.P. Hall Co.*, 750 F.3d at 663, and such prior precedent states a broader view of standing. *Id.* at 661 (*citing In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) for the proposition that "everyone with a claim to the *res* [the debtor's assets] has a right to be heard before the *res* is disposed of since that disposition will extinguish all such claims.").

Second, not all parties with a statutory right to be heard under the Bankruptcy Code have a pecuniary interest in the outcome of a matter. A trustee, for example, has no pecuniary interest in the outcome of a bankruptcy case, but is statutorily afforded the right to be heard. 11 U.S.C. § 1109(b); *accord In re South Beach Sec., Inc.*, 606 F.3d 366, 370–71 (7th Cir. 2010) (United States

---

[9]    For some reason, Bankruptcy Rule 6004(a) cross references all of the Bankruptcy Rule 2002 subsections governing asset sales *except* Bankruptcy Rule 2002(d)(3), which provides for the notice to equity security holders in chapter 11 cases.

Trustee has a right to be heard on all matters in bankruptcy). Where the pecuniary interest rule conflicts with statutory standing, statutory standing must prevail. *Lexmark*, 572 U.S. at 128 ("Just as a court cannot apply its independent policy judgment to recognize a cause of action Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates.") (internal citation omitted).

Third, applying the pecuniary interest rule without exception, would negate the existing law on authority challenges, as discussed below. An out-of-the-money chapter 7 debtor would, under such a strict application of the pecuniary interest rule, have no standing to be heard in her bankruptcy case. *Cult Awareness*, 151 F.3d at 315 ("Debtors, particularly Chapter 7 debtors, rarely have such a pecuniary interest because no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor."). How then could such a debtor seek Rule 60 relief if her attorney made unauthorized concessions?

As the same out-of-the-money reasoning has been applied to shareholders in chapter 7 cases, *In re Schultz Mfg. Fabricating Co.*, 956 F.2d 686, 692 (7th Cir. 1992) (shareholder of a chapter 7 debtor had no legal standing to be heard in the case), such shareholders under the pecuniary interest rule would arguably lose their right to manage a debtor upon the filing of any bankruptcy case, not just a chapter 7 one. That simply cannot be the case. Stockholders are afforded a statutory right to be heard on all matters in a chapter 11 proceedings. 11 U.S.C. § 1109(b). Further, doing so would redefine state law rights, ones not directly affected by the filing of a bankruptcy alone. Notwithstanding the arguments of the Opposing Parties to the contrary, nothing in bankruptcy stands for the proposition that a corporation may ignore its state law mandated rules of governance. *See In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 691 (Bankr. E.D. La. 2006) ("The general rules of corporate governance remain the purview of state law in a bankruptcy proceeding.") (*citing Manville Corp. v. Equity Sec. Holders Comm. (In re Johns–Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1986)).

Both the Opposing Parties and the Concerned Parishioners rely on *Johns–Manville* to argue that the Concerned Parishioners have or do not have standing, as they each read the case to mean different things. In *Johns–Manville*, the Second Circuit overturned a bankruptcy court order enjoining a debtor's shareholders' meeting, such order having been entered on the grounds that the meeting would impair the reorganization of the debtor. 801 F.2d at 64. In so doing, the Second Circuit affirmed "the shareholders' right to govern their corporation," stating that "the right to compel a shareholders' meeting for the purpose of electing a new board subsists during reorganization proceedings." *Id.*

The Concerned Parishioners, of course, read this language to mean that a debtor must follow its corporate governance rules even while in bankruptcy. Such rules are established as a matter of state law and continue to define the parties' rights in bankruptcy. *Accord Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.")

The Opposing Parties (and in particular the Chicago Purchaser) argue that *Johns–Manville* leads to a different result. The parties appear to argue that, as applying state law governance rules might lead to a debtor acting in a manner inconsistent with its duties, there is a federal interest in abrogating such rules in bankruptcy. While such an argument does lip service to the language of *Johns–Manville*, the result is the complete opposite of what *Johns–Manville* actually stands for. Further, such argument belies the fact that nothing compels a debtor to adhere to its fiduciary obligations.

This court could no more order a debtor to comply with its fiduciary obligations that it could order a debtor to sign and submit its bankruptcy schedules, something a debtor must do under the Bankruptcy Code. As with all such duties, the debtor has free will to act in a manner inconsistent with its statutory duties. It must, however, face the ramifications of its actions.

The Chicago Purchaser further argues that *Johns–Manville* somehow stands for the proposition that only the right to call a shareholder meeting survives a bankruptcy filing. Because, it is argued, the Second Circuit noted that the right to govern a corporation subsists, all other rights must fall away. The problem with that argument is twofold. First, nothing in *Johns–Manville* stands for that proposition at all. By confirming one right, the Second Circuit did not by reverse, negative implication extinguish all others. Second, Congress showed in the Bankruptcy Code that it was capable of interfering with and extinguishing state law rights. *See, e.g.*, 11 U.S.C. § 365(d)(3) (compelling a debtor to perform its state law contracts, except for so-called *ipso facto* clauses abrogated by section 365(b)(2)); 11 U.S.C. § 1125(e) (providing a party soliciting votes in good faith on a bankruptcy plan postpetition is not liable for violations of state law rules of otherwise governing such solicitation). Section 1125(e), for example, shows a clear indication by Congress when corporate governance rules might be ignored. No such indication exists in the context here.

The pecuniary interest rule is a judicial gloss on the judicial concept of prudential standing, and the Seventh Circuit has cautioned against the over application of such glosses. *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013) ("It is important to not allow judicial glosses . . . to supersede the statute itself."). For these reasons, the court declines to determine that the pecuniary interest rule defeats the Concerned Parishioners' argument that they have standing to challenge whether the Debtor's acts were authorized.

2.    *Failure to Object*

The Opposing Parties also argue that the Concerned Parishioners' failure to object to the sale of the Chicago Property denies them standing to be heard on the Rule 60 Motion. No direct case law to that effect was provided, however, and to the best of the court's ability to confirm, no such hard and fast rule exists.

While it is true that the Seventh Circuit has made clear that a Rule 60 motion should not be used to raise arguments that could have been raised at the initial ruling, *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010) ("Rule 60(b) may not be used to propound new legal theories that could have been raised prior to entry of judgment."), when such arguments include—as they do here—a lack of notice, to foreclose such an argument would allow a denial of due process to go unchecked.

To be clear, the Concerned Parishioners' argument for lack of notice is shaky, at best. The Concerned Parishioners simply do not comfortably fit any of the categories of parties required to be noticed and/or served. At best, the Concerned Parishioners are a loose analog to equity shareholders in this context, but that is, as is further discussed below, a weak argument. In any event, the argument of the Opposing Parties regarding notice is not one of standing, *per se*, but rather one of the scope of Rule 60 consideration. That scope is also best taken up below.

For those reasons, and because the strict application of the pecuniary interest rule could potentially foreclose the Concerned Parishioners from their rights, whatever those rights may be, the court declines to find that that the Concerned Parishioners lack standing here.

C.    <u>Lack of Authority</u>

This brings us to the essence of the Concerned Parishioners' argument: that the Debtor lacked the authority to request the entry of the Chicago Sale Order as the Debtor lacked the authority to sell the Chicago Property.

1.    *Lack of Authority Generally*

Lack of authority as grounds for reconsideration is well-established, but has been considered most often in the context of attorneys acting without authorization for their clients. *See, e.g., Bradford Exch. v. Trein's Exch.*, 600 F.2d 99, 102 (7th Cir. 1979) (finding a lack of authority blended allegations of mistake and inadvertence and was grounds for a Rule 60 motion) (*citing United States v. Beebe*, 180 U.S. 343, 353 (1901)). It has, however, been used in broader contexts of authority. *United States v. Krilich*, 152 F. Supp. 2d 983, 991–92 (N.D. Ill. 2001).

The *Krilich* case involved a consent decree between the United States and land developers concerning the use of wetlands and compliance with the Clean Water Act. *See id.* at 986–90. The developers brought a motion challenging the consent decree on the ground that the United States had no authority to enter into the same given an alleged lack of federal jurisdiction over some of the underlying wetlands covered by the decree. *See id.* The court analogized the developer's motion to motions under Rule 60(b)(1) to set aside settlement agreements entered into by attorneys without client consent and held that the developers' "*ultra vires* contentions . . . may properly be classified as being a claim of *mistake of law* under Rule 60(b)(1)." *Id.* at 992 (*citing Webb v. James*, 147 F.3d 617, 622 (7th Cir. 1998)) (emphasis added).[10]

The conclusion that lack of authority is a mistake of law, however, has greater meaning when the Rule 60 motion claiming such is brought outside of the time for an appeal. Recall that the Seventh Circuit has stated that Rule 60 motions should not be considered were the matters raised could have and should have been raised on appeal. *Mendez*, 725 F.3d at 659. The Seventh Circuit has even more clearly stated that proposition in the context of errors of law by the trial court. "Rule 60(b) 'is not intended to correct mere legal blunders' made by the district court, which are correctable on direct appellate review." *Eskridge v. Cook Cty.*, 577 F.3d 806, 809 (7th Cir. 2009) (*quoting Cash v. Ill. Div. of Mental Health*, 209 F.3d 695, 697 (7th Cir. 2000)).

As such, under *Krilich* at least, mistakes of law are not properly the subject of Rule 60 motions brought outside the time for an appeal.[11]

It is unclear though whether the District Court in *Krilich* considered the importance of its conclusion that mistaken authority is a legal conclusion and the Seventh Circuit has not spoken to

---

[10]    What is or is not *ultra vires* with respect to a corporation is a question of state law, as state law determines proper governance of the entities created thereunder. *See, e.g., Wisconsin Real Estate Inv. Tr. v. Weinstein*, 712 F.2d 1095, 1101 (7th Cir. 1983) (holding a trust's governance to be the equivalent of state corporate laws and finding a right under Wisconsin state law to sue for violation thereof). The court will consider this concept further when it discusses the overlay of secular and sacred laws applicable to this matter, *infra*.

[11]    A majority of courts appear to have adopted the position that, to conserve judicial resources, an error of law may be heard via a Rule 60 motion if the motion is brought within the time for appeal. *See Sowers v. Sec'y of Health & Human Servs.*, 625 F. Supp. 97, 99 (S.D. Ohio 1985) (citing cases from numerous Circuits).

this issue. The Circuit in *Bradford Exchange*, however, uses language that might imply a different result, *Bradford Exch.*, 600 F.2d at 102 ("'[T]he question of authority in this respect blends into a consideration of the allegations of mistake and inadvertence.'") (*quoting Assocs. Discount Corp. v. Goldman*, 524 F.2d 1051, 1054 (3rd Cir. 1975)).

As a result, the court will take up the remaining issues before determining whether the Concerned Parishioners' challenge to the Chicago Sale Order is well taken.

2.    *Ecclesiastical Authority*

The Concerned Parishioners' lack of authority argument does not easily resolve itself into any of the foregoing discussion of general authority. That is because the Concerned Parishioners' argument, at its essence, relies on church doctrine.

The Debtor here is not just a church but is one of the oldest Greek Orthodox churches in the country. *See* Bank's Resp., Exh. B (the "Formation Statement"). The Formation Statement, dated October 15, 1897, demonstrates that the Debtor was formed under the Illinois Religious Corporation Act of 1872. 805 ILCS 110/0.01 *et seq.* (the "RCA").[12]

As a church, the Debtor is protected by the Constitution's prohibition on abridging the free exercise of religion. U.S. Const. amend. I. ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."). This prohibition gives rise the ecclesiastical abstention doctrine which, put simply, forbids courts from involving themselves in matters of religious discipline, faith, internal governance, customs, rules, or law. *Watson v. Jones*, 80 U.S. 679, 728–30 (1871); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 182–87 (surveying history of the ecclesiastical abstention doctrine). The doctrine reflects "a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government . . . ." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

That is not to say that this court is powerless to consider the question before it. There is, as was well outlined by the Illinois Appellate Court, a fine line to be walked here.

The role civil courts may play in resolving church property disputes is severely circumscribed by the first amendment's guarantee that the right to the free exercise of religion will not be abridged (U.S. Const., amend. I). *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775, 784 (1979); *Hines v. Turley*, 246 Ill.App.3d 405, 417, 186 Ill.Dec. 194, 615 N.E.2d 1251 (1993). Because of this limitation, civil courts have no authority to resolve church property disputes that turn on matters of church doctrine, practice, polity, or administration. *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill.App.3d 700, 713, 157 Ill.Dec. 214, 572 N.E.2d 283 (1991). But, where these matters are not involved in a church property dispute, the court may choose from a variety of approaches in resolving the dispute. 213

---

[12]    While the Debtor could have, as many older churches have done, reincorporated under the Illinois General Not for Profit Corporation Act of 1986, 805 ILCS 105/101.01 *et seq.*, no evidence of such reincorporation has been provided. As such, the court must apply the RCA to the matter.

Ill.App.3d at 713, 157 Ill.Dec. 214, 572 N.E.2d 283. Among these approaches is the "neutral principles of law" endorsed in *Jones*, 443 U.S. at 602–03, 99 S.Ct. at 3025, 61 L.Ed.2d at 784–85, and recognized and, where appropriate, applied in Illinois. *Tanios*, 213 Ill.App.3d at 714, 157 Ill.Dec. 214, 572 N.E.2d 283.

*Apostolic New Life Church of Elgin v. Dominquez*, 686 N.E.2d 1187, 1191 (Ill. App. Ct. 1997).

The court need not even consider the neutral principles of law approach, *Jones*, 443 U.S. at 602–03, when examining the RCA and its contents. The RCA is secular law and its interpretation is part of this court's mandate.

The RCA, though, is quite deferential when it comes to matters of governance of Illinois religious corporations, referring throughout to "the usages and customs, rules or regulations of such congregation, church or society." 805 ILCS 110/35. Nonetheless, the trustees appointed thereunder, *id.*, and replaced according to the rules, usages or by-laws of the congregation, church or society, 805 ILCS 110/39,

> shall have the care, custody and control of the real and personal property of the corporation, *subject to the direction of the congregation, church or society*, and may, when directed by the congregation, church or society, erect houses or buildings and improvements, and repair and alter the same, and may, when so directed, mortgage, incumber, *sell and convey any real or personal estate of such corporation*, and enter into all lawful contracts in the name of and in behalf of such corporation ....

805 ILCS 110/43 (emphasis added).

The RCA thus empowers the trustee to sell and convey real property but does so subject to the direction of the congregation, church or society. *Id.* That calls into question how such direction shall be given.

Once again, the court may utilize the neutral principles of law approach to utilize relevant by-laws, religious constitutions and state statutes to determine the ownership and control of church property. *Jones*, 443 U.S. at 603–04. In so doing, however, the court must proceed with caution as to not overstep its bounds. *See id.* at 602 ("[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.").

Here, the parties do not contest that the Debtor is subject to the hierarchy of the Greek Orthodox Diocese of America and is so bound by its Uniform Parish Regulations. Stipulations, at p. 2, ¶¶ 6–7; *see also id.*, Exh. B (the "Uniform Regulations"). Those Uniform Regulations provide that a

> Parish may purchase real and person property, or sell, mortgage, or otherwise encumber its real property . . . upon approval of two-thirds (2/3) of the parishioners in good standing present at a Parish Assembly duly called (with at least ten (10) days prior written notice) for that purpose, provided that approval from the respective Hierarch is received . . . .

Uniform Regulations, art. 16, sec. 3.

The Uniform Regulations define the Metropolitan as "[t]he head Hierarch of a Metropolis." *Id.* at p. ix. Here, the Metropolitan of the Metropolis containing the Debtor is Metropolitan Nathaniel, the Metropolitan of the Greek Orthodox Church of Chicago, Debtor's Resp., Exh. A (the "Approval of the Metropolitan"), and Metropolitan Nathaniel has apparently given hierarchical approval for the sale. *Id.*

The crux of the Concerned Parishioners' argument is, however, that while such approval may have been obtained, as the approval of two-thirds of the parishioners was not, the sale is unauthorized. The Opposing Parties, on the other hand, argue that the two-thirds vote requirement is simply a procedure to ensure that the Hierarch is not burdened with such requests. According to the Opposing Parties, such procedure is one of convenience for the Hierarch but is not an actual vested right of the parishioners.

Here is where neutral principles of law cease to be illuminating. To accept the Concerned Parishioners' argument, the court must conclude that the Archdiocese, in approving the Uniform Regulations, intended to divest the higher authorities within the church from making decisions. There is some evidence to support that. *See* Uniform Regulations, art. 10, sec. 2(M) (setting forth the Metropolitan's responsibilities and rights to include approving the purchase, sale, lease, mortgaging or other encumbrance of the real property of a Parish, but procedurally in accordance with Article 16, quoted above). This might be read to limit the Metropolitan's authority in this regard. It might also, however, be read as the Debtor suggests, as a procedural convenience. The language, in this context, is ambiguous.

By the same token, for the court to conclude that the church intended to vest in its parishioners a property right sufficient to require service under Bankruptcy Rule 6004(c) and sufficient to create a pecuniary interest in the outcome of the sale, the court must attempt to answer fundamental questions of the church's treatment of its parishioners.

Interpreting that ambiguity and resolving those fundamental questions would require this court to probe into the allocation of power within the church, to attempt to posit the church's intent and polity regarding the rights of its parishioners. That, quite simply, cannot happen. *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 709 (1976) ("[T]o probe deeply enough into the allocation of power within a [(]hierarchical) church so as to decide . . . religious law (governing church polity) . . . would violate the First Amendment in much the same manner as civil determination of religious doctrine.") (*quoting Md. & Va. Churches v. Sharpsburg Church*, 396 U.S. 367, 369 (1970) (Brennan, J., concurring)) (internal quotation marks omitted).

It should also be noted that the Uniform Regulations themselves have a dispute resolution mechanism. Uniform Regulations, addendum B (the "Dispute Resolution Procedures"). It is very clear from even a cursory reading of those procedures that the church anticipated its members to use those procedures to resolve such issues. *Id.* ("In all Disputes that involve ecclesiastical, theological, canonical, Church governance or *Church property* issues and that pertain to the life of the Parish or Church community, each Parish and Party shall adhere to the following Dispute Resolution Procedures.") (emphasis added). As *Milinojevich* instructs, secular courts must abstain and defer on matters such as these to the decision of the highest court of a hierarchical church organization. *Milivojevich*, 426 U.S. at 724–25.

When questioned at the Hearing why the Concerned Parishioners had not availed themselves of such procedures, their counsel intimated that, given time, they would. There has been time, however.

As noted above, absent some property interest that the court cannot determine under these circumstances, nothing in the Bankruptcy Rules required the Debtor, in seeking to sell the Chicago Property, to give notice to the parishioners. But this is the second of two bankruptcy cases spanning more than four years with state foreclosure actions before and in between. In this case, the sale procedures were first requested by the Debtor in March of this year. The sale of the Debtor has made both local and national news.[13] It is simply not plausible that the Concerned Parishioners did not know of the sale or have an opportunity to exercise their rights under the Uniform Regulations or in a timely fashion before this court.

D.    Application to the Matter at Bar

In each of the foregoing inquiries, the Concerned Parishioners' request has faced obstacles, sometimes insurmountable ones: the standing of the Concerned Parishioners is dubious, at best; the scope of reconsideration sought is outside of that permitted for review of legal errors raised, not on appeal, but via Rule 60 after the time for appeal has expired; the Rule 60 Motion appears to be an end run around the protections afforded by section 363(m); and the question presented is one that turns on ecclesiastical law and was not pursued in the forum provided by the church for resolving such questions.

As noted above, relief under Rule 60 is discretionary and is based on the facts and circumstances of the case known best by the trial judge. Here, those facts and circumstances require that the Rule 60 Motion be denied.

CONCLUSION

For all of the foregoing reasons, the court concludes that the Chicago Sale Order is not appropriately subject to reconsideration in this matter and must, therefore, be denied. A separate order to that effect will be issued, concurrent with this Memorandum Decision.

Dated: October 25, 2019

Timothy A. Barnes
United States Bankruptcy Judge

---

[13]    *See, e.g., Virgin Mary Painting Shows 'Tears' at Chicago Church Facing Foreclosure: Reports*, Sept. 9, 2019, https://www.foxnews.com/us/chicago-greek-orthodox-church-virgin-mary-tears-bankruptcy (last visited Oct. 25, 2019).